WATKINS, Judge.
Rojo Oil Company, Inc. (Rojo), a Louisiana corporation domiciled in Springhill, Webster Parish, Louisiana, filed suit against Shirley McNamara, Secretary, Department of Revenue and Taxation, State of Louisiana (Department). The plaintiff seeks to recover Louisiana severance taxes of $47,854.40 paid under protest at the rate of 12.5% for the years 1983 and 1985. The trial court rendered judgment in favor of Rojo, and the Department has perfected this appeal.
The only issue is whether the operator of a waste salt water disposal facility is liable for a severance tax on marketable oil that is recovered from the waste salt water immediately prior to the final disposal of the salt water into an injection well. The issue appears to be res nova.
From our review of the testimony of the Department’s witnesses and our reading of *1097 the brief filed on behalf of appellee Rojo, we draw a description of the processes that ultimately result in marketable oil recovery from waste salt water.
The salt water comes from the bowels of the earth, with the oil. The effluent from the well is a mixture of gas, oil, and water. The producer routes the well effluent into a separator or a heater treater. The separator separates the gas from the liquid and separates most of the oil from the salt water. Most wells produce some waste salt water that has a small percentage of oil surrounding water droplets and vice versa; few facilities are sophisticated enough to separate every gallon of oil from the effluent.
In the past, waste salt water from the oil wells was dumped in huge, open pits next to the wells and left unattended. However, a number of years ago the Department of Conservation forced producers to dispose of this waste by re-injection into the earth below the water-bearing sand zones. Additionally, there are regulations concerning the purities of the waste salt water that can be re-injected.
Pursuant to current regulations, the salt water containing the oil droplets in emulsion goes from the heater treater into a settling tank. To achieve further, final separation, the producer must heat the salt water or inject it with chemicals that will break up the emulsion. The final separation has two results: the production of marketable oil, and the purification of the salt water to bring it within compliance with the conservation regulations before it goes into the injection wells.
Large oil field operators will accomplish the final separation at or near the well site. When this is done, the oil recovered in the final separation is not accounted for separately from the oil recovered in the initial separation. All of the oil is subject to the severance tax rate set forth in LSA-R.S. 47:633.
However, since the equipment and injection wells are expensive, the smaller operators often find it economically preferable to pay other companies to dispose of the waste salt water.
Rojo’s facility in Webster Parish is designated a salt water disposal facility. It is composed of an injection well and nine 400-barrel storage tanks. Salt water recovered from numerous oil wells within a 200-mile radius of the facility is transported in vacuum-transport trucks and is pumped into the tanks.
In addition to disposing of waste salt water from its own wells, Rojo is servicing the smaller operators. However, Rojo charges the other operators a certain price per barrel to dispose of the salt water. Thus, Rojo is the owner of the marketable oil at the time of the final separation when it is severed from the waste salt water. After the final separation Rojo sells the oil and injects the waste salt water into its well.
The Department’s witnesses testified at trial as to how the assessment against Rojo for the severance taxes paid under protest came about. The company “showed up” on the reports of the Department of Conservation as having disposed of (sold) “x” barrels of oil. Research proved that there was no tax paid on this oil. The Severance Tax Division of the Revenue Department has the responsibility of seeing that tax is paid on oil, and thus the Division made the assessment.
SEVERANCE TAX
Article 7, Section 4(B), of the Louisiana Constitution of 1974 provides:
Taxes may be levied on natural resources severed from the soil or water, to be paid proportionately by the owners thereof at the time of severance. Natural resources may be classified for the purpose of taxation. Such taxes may be predicated upon either the quantity or value of the products at the time and place of severance. No further or additional tax or license shall be levied or imposed upon oil, gas, or sulphur leases or rights.
The pertinent provisions of the legislative scheme for severance taxes are:
LSA-R.S. 47:631.
*1098 Taxes as authorized by ... the Constitution of Louisiana, are hereby levied upon all natural resources severed from the soil or water, including ... minerals such as oil, gas, natural gasoline, distillate, condensate, casinghead gasoline, sulphur, salt, coal, lignite and ores.... LSA-R.S. 47:632.
A.These taxes shall be paid by the owner or proportionately by the owners thereof at the time of the severance and become due and exigible monthly, as herein provided; they shall operate as a first lien and privilege on the natural resources which lien and privilege shall follow the natural resources into the hands of third persons whether in good or bad faith, and whether the same be found in a manufactured or unmanufac-tured state.
LSA-R.S. 47:633.
The taxes on natural resources severed from the soil or water levied by R.S. 47:631 shall be predicated on the quantity or value of the products or resources severed and shall be paid at the following rates:
[[Image here]]
(7)(a) On oil twelve and one-half per-centum of its value at the time and place of severance.
LSA-R.S. 47:634.
The following terms as used in this Part shall have the following meanings ascribed to them:
(1) “Owner” means owner at the time of severance.
(2) “Purchases on the open market” means purchases made in the absence of any contract or agreement requiring the purchaser to make payment direct to the owner of oil, gas or other natural resources.
(3) “Severed” means the point at which the natural resources are severed from the surface of the earth or water. LSA-R.S. 47:648.21.
A. The tax rate applicable to reclaimed oil which is reclaimed by class one salvage crude reclamation facilities which are permitted by the office of conservation shall be three and one eighth percent (3⅛%) of value received by the first purchase.
B. “Reclaimed oil” as it is used in this Part shall mean the reclamation of waste oil or slop crude oil and condensate from open pits, tanks, or other collectors at the lease production site. Provided however, that reclaimed oil shall not include any oil upon which any severance tax has previously been paid.
C. Any person, or affiliate of a person actually engaged in severing oil, gas, or other natural resources from the soil or water, or actually operating oil or gas property, or other property from which natural resources are severed, shall not be eligible for the tax rate applicable to reclaimed oil as set out in this Part.
The nature of a severance tax was delineated in the case of Gulf Refining Co. of Louisiana v. McFarland, 154 La. 251, 255, 97 So. 433, 434 (1923):
A severance tax, even though it is measured by the value of the property severed, is not a property tax; it is an excise tax upon the privilege of severing; just as an inheritance tax, even though measured by the value of the property inherited, is not a property tax, but an excise tax on the right of inheriting.
It appears to us that, in rendering judgment in favor of Rojo, the trial judge focused on the process employed by the waste water handler in producing the oil, instead of focusing' on the “privilege of severing” which is the taxable event. The trial judge stated that the oil in question should probably be taxed, but that the waste water handlers should get “some kind 'of consideration” for the fact that theirs was an operation separate from the original severing of the oil at the well. The consideration to which the judge alluded is the reduced tax rate paid by producers of salvage crude oil (LSA-R.S. 47:648.21). However, the parties conceded and the trial court recognized that even if the oil produced by Rojo through its waste water process could be classified as “reclaimed oil,” Rojo would not be entitled to the lower tax rate. The record reflects that Rojo falls into the *1099 classification of persons excluded by Paragraph C of LSA-R.S. 47:648.21.
The Louisiana Constitution authorizes a severance tax to be assessed against the “owners thereof at the time of severance.” Appellee relies particularly on the definitions of LSA-R.S. 47:634 in arguing that the owners are only the landowners and the oil companies producing the oil and salt water from the well and thereby severing it from the surface of the earth. Appellee claims that as an operator of a waste salt water disposal facility, Rojo is a non-owner under the statutes and cannot be taxed. If that were the case, then neither could the operators of the class one salvage crude reclamation facilities be taxed under LSA-R.S. 47:648.21. Appellee’s reading of LSA-R.S. 47:634 would render Section 648.21 subject to attack on the grounds of its constitutionality.
We find that the trial court erred in concluding that the provisions of LSA-R.S. 47:631-33 apply only to persons who initially sever oil (although still in solution with the salt water) from the surface of the soil. Such a narrow reading of the severance tax legislation would allow any resource which is not immediately measurable at the well or mine to escape taxation when it ultimately becomes measurable. Unscrupulous producers would no doubt hasten to devise lucrative schemes for delaying the separation process.
A clear explanation of the point at which the severance tax becomes due is given in the ease of United Gas Pipe Line Co. v. Whitman, 390 So.2d 913, 918 (La.App. 2d Cir.1980), writ denied, 396 So.2d 928 and 929 (La.1981): “Severance taxes are excise taxes upon the privilege or right to sever natural resources from the soil and are paid by the owner of the resource at the time it is produced.” (Emphasis supplied.)
In the instant case, Rojo was clearly the owner of the salt water and the oil at the time the oil was produced by extracting it from the salt water. Such a reading of the severance tax laws does violence to neither the letter nor the spirit of the law.
Consequently, we reverse the judgment of the trial court and dismiss the claim of Rojo for a refund of taxes paid under protest. Costs of this appeal are to be borne by the appellee.
REVERSED AND RENDERED.